IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DOUGLAS W. CORNETT,<br><br>*Defendant*. | Case No. 3:25CR91 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING & MOTION FOR UPWARD VARIANCE**

The United States of America, through its attorneys, Lindsey Halligan, United States Attorney, Thomas A. Garnett, Assistant United States Attorney, Harmeet K. Dhillon, Assistant Attorney General for the Civil Rights Division, and Kyle Boynton, Trial Attorney, hereby submits its position with respect to sentencing for defendant Douglas W. Cornett. The United States has reviewed the Presentence Investigation Report (PSR), Dk. No. 18, and does not dispute any of the facts or factors set out therein.

The defendant's applicable Sentencing Guideline range on Counts One and Two, based on his Total Offense Level of 33 and his Criminal History Category of I, is 135 to 168 months of imprisonment; he is subject to an additional mandatory 120 months of incarceration on Count Three. PSR ¶¶ 90-91.

After careful consideration of each of the statutory factors enumerated in 18 U.S.C. § 3553(a), the United States recommends that the Court vary upward and sentence the defendant to a term of Life imprisonment.[1] Such a sentence would be sufficient, but not greater than necessary,

---

[1] The United States moves for an upward variance herein based upon defense counsel's indication that they intend to ask for a life sentence and would like to jointly waive the sentencing cap in the plea agreement to

1

to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

## BACKGROUND

On the evening of February 28, 2024, the defendant climbed into his Honda Pilot SUV and drove away from his residence. He armed himself that night with a 9mm SIG Sauer pistol and two full magazines of ammunition. The defendant eventually merged on to Interstate 95, where he encountered a panel truck being driven by an individual that the defendant observed to be a Latino man. The defendant maneuvered his SUV behind the panel truck and began honking. The panel truck's driver, O.G., pulled into the right lane to allow the defendant to pass, but the defendant maintained his position on the truck's tail. O.G., now concerned, drove to a Quarles truck fueling station where one of his friends—an English speaker—worked. The defendant continued to trail the truck as O.G. pulled into the Quarles station. Approached by O.G.'s friend—the gas station employee—the defendant appeared to break off his pursuit, driving around the Quarles gas station and away from the panel truck.

But the defendant was only biding his time. When O.G. drove out of the Quarles station, the defendant put his SUV back into drive, and followed the panel truck as O.G. drove a short distance to a different gas station—a Sheetz gas station and convenience store located on I-95's Thornburg exit. The defendant maneuvered his SUV alongside the panel truck as O.G. pulled alongside the Sheetz's fuel pumps. Another one of O.G.'s friends—J.M., another Latino man—happened to be at the Sheetz station at this time. J.M., having been alerted by the Quarles employee to the defendant's ongoing pursuit of O.G., approached the defendant's car, and asked the defendant why he was following O.G.

---

permit the United States to join the defense in asking for a life sentence. Should a waiver not be filed or should the Court not accept the modification, the United States will withdraw its request for an upward variance and, consistent with the requirements of the plea agreement, request a Guidelines sentence of 288 months of incarceration.

2

The defendant did not answer this question—instead, he posed one of his own: How long, the defendant asked, had O.G. been in the United States? O.G.'s friend, J.M., translated the defendant's question for O.G., and then translated O.G.'s answer for the defendant: A year and a half. The defendant—still sitting behind the wheel of his SUV—pulled his SIG Sauer 9mm pistol, leveled it at O.G. and J.M., and began pulling the trigger. Four bullets slammed into the victims—two tore into O.G.'s belly, and another slammed into his arm; a fourth bullet ripped into J.M.'s stomach. Two more shots missed their targets, spinning away into the dark. The defendant threw his SUV into drive and fled, leaving his victims crumpled on the gas station's concrete pad.

On the night of February 28, the defendant chose to stalk and then attempt—six times—to kill O.G. and J.M. for one reason: he believed that they were Latino immigrants to the United States, and the defendant hated Latino immigrants.

On June 9, 2025, the United States charged the defendant for this conduct by way of a three-count Criminal Information filed in the Eastern District of Virginia, Richmond Division. Dk. No. 2, PSR ¶ 1. Counts One and Two charged the defendant with Hate Crime Involving an Attempt to Kill, in violation of 18 U.S.C. § 249(a)(2); Count Three, with Using, Carrying, Brandishing, and Discharging a Firearm During and In Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c). *Id*. On June 18, 2025, the defendant appeared before this Court and pleaded guilty to the Criminal Information pursuant to a written plea agreement with the United States. Dk. No. 12, PSR ¶ 2. Sentencing is set for November 13, 2025.

### POSITION ON SENTENCING

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing guidelines are "effectively advisory." *Id.* at 245. Nonetheless, the advisory nature of the Guidelines "does not mean that they are irrelevant to the imposition of a sentence." *United*

States v. Moreland, 437 F.3d 424, 432 (4th Cir. 2006); *see also United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Indeed, the Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (internal quotation omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

A sentencing court should first calculate the range prescribed by the sentencing guidelines after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.*

### A. The Advisory Guidelines Range

As noted above, the United States has no objection or corrections to the PSR. By separate filing, the United States will move the Court to award a one-level decrease in the defendant's offense level pursuant to U.S.S.G. § 3E1.1(b). With this reduction, the defendant's Total Offense Level as to Counts Two and Three is 33 and his Criminal History Category is a I. This yields a Guidelines range of 135 to 168 months. PSR ¶¶ 90-91. The defendant faces an additional mandatory term of 120 months on Count Three, to run consecutive to the sentence imposed on Counts One and Two.

### B. 18 U.S.C. § 3553(a) Factors

After the Court has properly calculated the Guidelines range and ruled upon all departure motions, the Court must then consider the factors identified in 18 U.S.C. § 3553(a) to fashion a

4

reasonable sentence. *Gall v. United States*, 552 U.S. 38 (2007). Here, the 3553(a) factors discussed below support an upward variance to a term of Life imprisonment.

### 1. Nature and Circumstances of the Offense

The nature and circumstances of the offense favor an upward variance to a Life sentence. The defendant stalked O.G. along an interstate and from one gas station to another for one pernicious reason: O.G.'s immutable characteristic of being Latino led the defendant to conclude that O.G. was in the United States illegally. When the defendant fired six rounds from his semiautomatic handgun, he did not just maim O.G. He shot and permanently injured J.M. as well, and sprayed additional rounds into the parking lot of one of the busiest gas stations in America. The surveillance video footage of the shooting shows an employee close by to the shooting ducking for cover, and many others in the parking lot at the time likely feared for their lives in those moments. The defendant's attack was completely unprovoked, and he had no actual knowledge of whether his victims were lawfully or unlawfully present in the United States.

But the victims in this case are not limited to O.G. and J.M. Nor are they limited to the employees and patrons at the Sheetz station during the shooting. Hate crimes victimize entire communities. At the sentencing hearing in the Commonwealth's prosecution of the defendant, a Spotsylvania County Deputy Sheriff testified to the devastating effect the defendant's crime had upon the greater Latino community in Spotsylvania, to which the Deputy served as a liaison. That is the effect of hate crimes – violence that physically harms one or two specific individuals cuts at the fabric of an entire community's sense of belonging and safety. *See United States v. Howald*, 649 F. Supp. 3d 956, 961 (D. Mont. 2023).

For the defendant, this harm was not just collateral or incidental. He fantasized about this kind of community impact—his belief that visiting violence on immigrants would terrify and

5

dissuade other Latino immigrants from coming to his community. When interviewed by the Spotsylvania County Sheriff's Office after the shooting, the defendant described imagining machine gunning immigrants at the border from an attack helicopter 'to deter' others from entering the United States. PSR ¶ 19.

The defendant's crime has done devastating and permanent physical, psychological, and emotional harm to O.G. and J.M., their families, and their communities. Yet despite this, the defendant shows little, if any, remorse for his reprehensible actions—in the moments after his arrest, having just acknowledged repeatedly shooting O.G. and J.M., the defendant vented to the detective interviewing him about his anger and resentment towards Latino immigrants, telling the detective that he was "pissed" about his (apparent) belief that immigrants received financial assistance from the government. PSR ¶ 10. Later in that same conversation, as noted earlier, the defendant unapologetically described his fantasy of conducting mass murder at the southern border—apparently relishing both this grotesque image and its criminality (wondering out loud to the detective, before explaining this fantasy, "whether he could be 'charged for my thoughts.'"). PSR ¶ 10.

While he has accepted responsibility and is entitled to credit for that under the Guidelines, the defendant's lack of sincere remorse is yet another basis for an upward variance. *See, e.g., United States v. Ortiz-Torres*, 873 F.3d 346, 348 (1st Cir. 2017).

Finally, while the defendant's guidelines are properly calculated, the United States notes that those guidelines do not account for certain aggravating aspects of the defendant's criminal conduct. Chief among those is the very nature of the defendant's attack that night: far from being the product of a sudden drug or alcohol-fueled passion, the defendant deliberately stalked his victim over the course of that evening. He trailed O.G. on I-95; he followed O.G. into the Quarles

station; he followed O.G. into the Sheetz station; and he struck only when he believed he had the best chance to kill his victim.  Approached at the Quarles station by an employee concerned about O.G.'s safety, the defendant was intimidated or deterred enough by this evidence that others were monitoring his behavior to withdraw into the shadows, appearing to break off his pursuit until O.G. left the relative safety of the Quarles station to drive to Sheetz—a faux-retreat that demonstrated the depth of his commitment to his plan to attack O.G.; his determination that his attack be successful; and his simultaneous desire for self-preservation.

The nature and circumstances of the defendant's criminal conduct merit an upward variance to a Life sentence.

### 2. History and Characteristics of the Defendant

The defendant was born in Washington, D.C. and resided primarily in Maryland during his formative years.  PSR ¶¶ 54-66.  The defendant's childhood was turbulent, and he reports being raised with little parental involvement or supervision; he describes his parents as "mentally abusive" due to their neglect.  PSR ¶¶ 61-66.  The defendant has never been married; he does have one child, a son in his mid-30's, with whom he has no contact and no apparent relationship.  PSR ¶¶ 67-68.

The defendant reports that he was diagnosed with Chronic obstructive pulmonary disease (COPD) in 2021.  PSR ¶ 71.  More recently, x-rays conducted during the defendant's incarceration at Rappahannock Regional Jail revealed nodules that were subsequently confirmed to be lung cancer.  PSR ¶¶ 72-74.  The defendant is currently receiving chemotherapy treatment.  PSR ¶ 72.  The PSR provides a more detailed account of the defendant's diagnosis and treatment, via the defendant's treating physician, at PSR ¶ 74.  The defendant reports that he suffers from depression and that he has attempted suicide three times (most recently at age 40; he advised the Probation

Officer that he no does not feel suicidal at present). PSR ¶¶ 76-78. The defense obtained a forensic neuropsychological evaluation for the defendant; the examining psychiatrist diagnosed the defendant with Attention Deficit Hyperactivity Disorder (ADHD). PSR ¶¶ 78.

The defendant has a lifelong history substance abuse, reporting that he has used marijuana and alcohol since the age of 11, and that he used them "daily during his last year at liberty." PSR ¶ 79. The defendant also advised the Probation Officer that he has used cocaine, inhalants, mushrooms, LSD, and prescription drugs over the course of his life. PSR ¶¶ 80-85.

The defendant did not complete high school, withdrawing in his senior year. His most recent employment history consists of working as a heavy equipment operator at Virginia Energy Services; he worked at that business from 2010 until August 2023, when his employment was terminated following his assault on a coworker. PSR ¶ 88.

The defendant has misdemeanor convictions for Breaking and Entering (in 1985) and Sexual Assault (in 1987) for which he received probationary sentences. PSR ¶¶ 42-43. More recently, the defendant was convicted of misdemeanor Assault and Battery of a Family Member in 2004 (sentenced to 12 months jail, with 11 suspended) and 2010 (sentenced to 12 months jail, with three months suspended). PSR ¶¶ 44-45. The defendant was charged and convicted in the Spotsylvania Circuit Court for the instant offense conduct, and sentenced to Life imprisonment on two counts of Malicious Wounding—Victim Impaired; five years on two counts of Hate Crime—Assault & Battery; and three years on two counts of Use of a Firearm in Felony, First Offense. PSR ¶ 46.

The defendant has been convicted twice of Reckless Driving, including most recently in Chesterfield County in 2016, receiving a suspended sentence of 90 days; his probation was later revoked in 2017. PSR ¶ 30-31. He was convicted in 2017 of Failure to Appear (also in

Chesterfield County), and ordered to pay a fine and court costs. PSR ¶ 32. The defendant has a Criminal History Score of one, and a resulting Criminal History Category of I. PSR ¶¶ 33-35.

The defendant's history and characteristics also favor an upward variance. During the instant offense, the defendant claimed to be under the influence of drugs and alcohol. His history of drug and alcohol abuse suggests he may struggle with relapse during any period of supervised release. The facts of this case indicate that even a momentary relapse could result in tragic recidivism. Additionally, the United States expects that the defense will argue that the defendant's health issues favor a Life sentence to ensure he is not returned to the Commonwealth of Virginia at an advanced age where the transfer of custody and disruption to medical treatment could prove fatal. The United States concurs that the defendant's continuing medical needs will be best addressed by a Life sentence in the custody of the Bureau of Prisons.

### 3. Need to Afford Adequate Deterrence, Reflect the Seriousness of the Offense, and Provide Just Punishment

Protecting the public and deterring additional criminal conduct is another factor that courts are directed to consider under Section 3553(a)(2)(B)-(C). This Court will better ensure public safety and deter the defendant's future criminal conduct by sentencing him to Life. The defendant's attempts to murder the victims in this case were completely unprovoked and came with no outward warning to the victims, nor to friends and family around the defendant. The defendant admitted—or perhaps more accurately, bragged—to law enforcement that he seethed with lethal hatred for an entire class of humanity. When he saw an opportunity to actualize his murderous fantasy of killing Latino immigrants, the defendant did just that.

Given the nature of the defendant's criminal conduct and the defendant's candid profession—after confessing to attempting to kill his victims—that he fantasized about committing murders of Latino immigrants on an even grander scale, there is every reason to believe that a Life

9

sentence, a modest upward variance from 288 months, is necessary to protect the public from the defendant and deter additional crimes. *See United States v. Hernandez-Villanueva*, 473 F.3d 118, 123 (4th Cir. 2007) (affirming upward variance of three times the high end of the applicable sentencing range of six months where court concluded that the applicable sentencing range for unauthorized reentry "failed to sufficiently promote respect for the law, deter further criminal conduct, and protect the public").

In addition to the need for specific deterrence, the offense conduct, a violent hate crime involving a firearm and two attempted murders, strongly favors a sentence that deters other individuals who may be contemplating similar violence acts. An upward variance to a Life sentence in this case will provide the appropriate disincentives to those contemplating similar criminal conduct. *See e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized."); *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976) (stating that absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved.).

## **CONCLUSION**

For the reasons discussed above, the United States respectfully recommends that the Court sentence the defendant to a term of Life imprisonment.

                Respectfully submitted,

                Lindsey Halligan
                United States Attorney

By:      /s/
                Thomas A. Garnett
                Assistant United States Attorney
                Virginia Bar No. 86054
                United States Attorney's Office
                919 E. Main Street, Suite 1900
                Richmond, Virginia 23219
                Phone:  (804) 819-5400
                Fax:  (804) 819-7417

                Harmeet K. Dhillon
                Assistant Attorney General
                Civil Rights Division

By:      /s/
                Kyle Boynton
                Trial Attorney
                Virginia Bar No. 92123
                Civil Rights Division
                150 M St NE
                Washington, DC 20530
                Phone:  (202) 598-0449